## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF PROVIDENCE, Individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>(1) SPIRIT AEROSYSTEMS HOLDINGS, INC.,<br>(2) THOMAS C. GENTILE III,<br>(3) JOSE GARCIA, and<br>(4) JOHN GILSON,<br><br>      Defendants. | Civil Action No:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Employees' Retirement System of the City of Providence ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through its attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all persons or entities who purchased or otherwise acquired publicly traded Spirit securities from October 31, 2019 through February 27, 2020, inclusive (the "Class Period"). The action is brought against Spirit and certain

of its officers and/or directors (collectively, "Defendants") for violations of Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated

thereunder.

2.     Spirit is one of the largest independent non-Original Equipment Manufacturer ("OEM")

commercial aerostructures designers and manufacturers in the world.  The Boeing Company ("Boeing")

is the Company's largest and most important customer, accounting for approximately 80 percent of

Spirit's revenues in 2018 and 2019.  The majority of these revenues are dependent on Boeing's 737

MAX airliners, which alone represent 50 percent of Spirit's revenues.

3.     Following the second tragic crash of a 737 MAX plane in March 2019, all 737 MAX

airliners were grounded globally.  At the time of the filing of this Action, 737 MAX planes remain

grounded.

4.     Throughout the Class Period, market concern regarding Spirit's financial stability

mounted in light of the continued grounding of the 737 MAX planes.  Defendants, however, assuaged

concern by stating they were "continuing to produce at a rate of 52 aircraft per month," which would

purportedly allow them to "burn off the excess inventory after Boeing transitions to [a] rate [of] 57" 737

MAX planes per month.  Further, Defendants stated that they had "made good progress" on "actions on

cost control and working capital to mitigate the impact," "following the MAX grounding."

5.     Moreover, Defendants were questioned directly by analysts regarding the impact on

production rates should the 737 MAX be grounded for longer than currently expected, specifically

referencing "excess inventory."  Defendants first stated that despite the fact they were "producing at a

higher rate than Boeing," that "[i]f Boeing goes down more," they would "work closely with Boeing to

determine what the right production level is."  Further in response, Defendants stated that the Company

was "going to be at a rate of 52" MAX planes per month "for an extended period of time which will

allow [the Company] to get more stable and allow [its] supply chain to get healthy."

6.    Defendants' assurances, however, that 737 MAX production rates were "going to be at a rate of 52" per month "for an extend period of time," were hollow.  Because Boeing had continued to produce 737 MAX aircraft post-grounding, it was sitting on a massive glut of unsold planes.  Therefore, Defendants knew or recklessly disregarded that this inventory buildup was reasonably likely to cause Boeing to temporarily halt 737 MAX production, which in turn, would have a significant negative impact on the Company's future financial results.

7.    Additionally during the Class Period, Defendants attested to the accuracy of Spirit's financial reporting and the effectiveness of the Company's internal controls.

8.    Throughout the Class Period, Defendants made materially false and/or misleading statements by misrepresenting and failing to disclose the adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Boeing was sitting on a glut of unsold 737 MAX airplanes, and was therefore reasonably likely to suspend production in 2020; (ii) a production halt on the 737 MAX planes would have a significant negative impact on the Company's future financial results; (iii) the Company lacked effective internal controls over financial reporting; (iv) the Company did not comply with its established accounting principles related to potential contingent liabilities; and (v) as a result, Defendants' statements about Spirit's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    On December 16, 2019, after the close of trading, Boeing announced that it was suspending all production of 737 MAX planes in 2020.  Of the reasons given, Boeing stated that because it had continued production of the 737 MAX planes "[t]hroughout the grounding," that it had "approximately [737 MAX] 400 airplanes in storage," and had halted production to maintain "supply chain health."  The impact of a 737 MAX production halt, which historically accounted for 50 percent

of Spirit's revenues, was directly contrary to Defendants' recent positive assurances regarding 737

MAX production levels.  This production halt, therefore, would have a substantial negative impact on

Spirit's financial outlook for 2020.  On this news, the price of Spirit stock declined $3.10, or nearly 4

percent on the following two trading days, closing at $75.78 on December 18, 2019.

10.     On January 10, 2020, during intraday trading, Spirit issued a press release announcing

that due to Boeing's decision to suspend production of the 737 MAX planes, that it had terminated

"approximately 2,800 employees at its Wichita, Kansas facility."  The press release additionally stated

that due to Spirit's excess inventory and Boeing's hundreds of plans in storage, once 737 MAX

production resumed "levels [would] be lower than previously expected."  On this news, the price of

Spirit stock declined $3.09, or over 4 percent, to close at $69.70 on January 10, 2020.

11.     To make matters worse, on January 30, 2020, before the market opened, the Company

issued a press release announcing that Spirit had determined it did not comply with its accounting

procedures regarding its potential contingent liabilities.  As a result, Spirit additionally revealed that

Defendants Jose Garcia ("Garcia"), Spirit's Chief Financial Officer ("CFO"), and Defendant John

Gilson ("Gilson"), Spirit's Vice President of Finance and Controller, had resigned.  On this news, the

Company's shares fell $2.56 per share or approximately 4 percent to close at $65.08 per share on

January 30, 2020.

12.     Finally, on February 28, 2020, the Company gave further insight into its previous

announcement that it may have failed to account for certain potential contingent liabilities. On that date,

Spirit announced that it had identified a material weakness in its internal controls over financial

reporting, and as a result thereof, the Company "should have recorded an incremental contingent

liability for the third quarter of 2019 of less than $8 million."

13.     Also on February 28, 2020, Spirit held an earnings call with analysts and investors to

discuss Spirit's 2019 financial results.  On the call, Defendant Thomas C. Gentile III ("Gentile"),

Spirit's Chief Executive Officer ("CEO"), revealed that 737 MAX production rates in 2020 would be over 66 percent lower than those in 2019, and would not normalize for the next several years.   As a result, it was revealed by the Company's newly-appointed CFO that "2020 will be a difficult year" for Spirit.  On this news, the price of Spirit stock declined $6.19 per share, or 10 percent on February 28, 2020, closing at a price of $52.84 per share.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company conducts business and has operations in this judicial district and alleged misstatements and the subsequent damages took place in this judicial district.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

19.     Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased Spirit securities during the Class Period and was economically damaged thereby.

20.     Defendant Spirit purports to design, manufacture, and supply commercial aero structures in the United States and internationally.  Spirit is a Delaware corporation located at 3330 N. Mingo Rd., Tulsa, Oklahoma 74116.  Spirit securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SPR."

21.     Defendant Gentile has been the Company's  CEO throughout the Class Period.

22.     Defendant Garcia served as the Company's CFO from January 9, 2019 until January 29, 2020.

23.     Defendant Gilson served as the Company's Vice President of Finance and Controller from January 8, 2018 until January 29, 2020.

24.     Defendants Gentile, Garcia, and Gilson are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Spirit's reports to the SEC, press releases, and presentations to common stock analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

6

25.     Spirit is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Spirit under *respondeat superior* and agency principles.

27.     Defendant Spirit and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Spirit is one of the largest independent non-OEM commercial aerostructures designers and manufacturers in the world.  The Company designs, engineers, and manufactures large, complex, and highly engineered commercial aerostructures such as fuselages, struts/pylons, wing structures, and flight control surfaces.

29.     Beginning in the fourth quarter of 2016, Spirit has traditionally issued a quarterly dividend on shares of its outstanding common stock.  The dividend was originally $0.10 per share, but increased to $0.12 per share for the second quarter of 2018, and continued at that amount throughout 2019.

30.     Boeing is the Company's largest and most important customer, accounting for approximately 80 percent of Spirit's revenues in 2018 and 2019.  The majority of these revenues are dependent on Boeing's 737 MAX airliners, which alone represent 50 percent of Spirit's revenues.  In addition, Spirit is responsible for 70 percent of the Boeing 737 MAX production, including the fuselage and wing components.  As a result, continued productions of the 737 MAX planes are integral to the Company's financial wellbeing.

31.      On March 10, 2019 a 737 MAX plane operating Ethiopian Airlines Flight 302 crashed, prompting all 737 MAX planes to be grounded globally.  A 737 MAX plane had previously crashed while operating Lion Air Flight 610 on October 29, 2018.  At the time of the filing of this Action, the 737 MAX planes remain grounded.

32.      Following the grounding of the 737 MAX planes and leading up to the start of the Class Period, Spirit's monthly 737 MAX production rates had been in flux, but appeared to have stabilized. At the outset of 2019, the Company had expected a production rate of 57 737 MAX planes per month. On April 5, 2019, Boeing announced that it would make a temporary adjustment in the production rate of the 737 MAX aircraft from 52 to 42 aircraft per month.  Subsequent to Boeing's announcement, and pursuant to a Memorandum of Agreement executed with Boeing (the "MOA"), Spirit announced that it would maintain a 737 delivery rate of 52 shipsets per month in an effort to minimize supply chain disruptions.

**Materially False and Misleading Statements Issued During the Class Period**

33.      The Class Period begins on October 31, 2019.  On that date, Spirit reported its financial results for the third quarter of 2019.  The press release stated that the Company was "continu[ing] to produce at a rate of 52 aircraft per month in accordance with its agreement with Boeing."  Defendant Gentile attributed Spirit's "solid results" as being "driven by improved operational performance and the cost mitigation actions we implemented last quarter to lessen the financial impact of remaining at a rate of 52 aircraft per month on the 737."  Defendant Gentile was later quoted stating that Defendants "communicate with Boeing regularly" and "coordinate [their] production rates . . . based on the timing of the 737 MAX returning to service."  Finally, Defendant Gentile was also quoted stating that he was "confident" on the "long-term outlook for the 737 MAX."

34.     Additionally on October 31, 2019, Defendants held an earnings call with analysts and investors to discuss Spirit's third quarter.  On the call Defendant Gentile gave guidance and insight into the Company's visibility concerning 737 MAX production rates, stating in pertinent part:

> We are continuing to produce at a rate of 52 aircraft per month as we agreed with Boeing and currently have about 65 shipsets in storage at our facilities. We communicate with Boeing regularly and we'll coordinate our production rates with them, based on the timing of the MAX returning to service.
>
> * * *
>
> Our current expectations are that we will continue to produce at rate 52 in order to burn off the excess stored inventory after Boeing eventually transitions to rate 57. Given current production and storage levels, our expectation is that we will not produce at a rate higher than 52 through 2020, 2021 and possibly into 2022.

In addition, Defendant Gentile stated that Spirit's cost impact initiatives in regards to the 737 MAX grounding had begun to show "the benefits of a stable production rate," stating in pertinent part:

> Operationally following the MAX grounding, we've taken actions on cost control and working capital to mitigate the impact and have made good progress. We made solid progress on our cost mitigation targets this quarter and even as we made investments in improved quality and efficiency, we are starting to see some of the benefits of a stable production rate in our factories. Our focus for the remainder of the year will be to sustain progression towards optimizing our factories to deliver on our margin targets next year.

35.     Additionally on the October 31, 2019 call, Defendant Garcia touted the $12 million dividend paid to shareholders that quarter, representing $0.12 per share.  In his comments, Defendant Garcia attributed this to Spirit's "commitment to a disciplined and balanced approach to capital deployment," which "remain[ed] unchanged."

36.     In the question and answer portion of the October 31, 2019 call, Defendant Gentile was directly questioned as to what would happen to production rates should the 737 MAX be grounded for longer than currently expected, specifically referencing "excess inventory."  In response, Defendant Gentile answered that the Company had high visibility into 737 Max production needs and supply chain,

and an open and ongoing dialogue with Boeing.  Defendant Gentile also stated that Spirit would remain

at a production rate of 52 737 MAX planes for "an extended period of time," stating in pertinent part:

> We have. We've run scenarios at all different levels of production. And it really depends on when the MAX goes back into service and how Boeing decides to manage its production schedule.
>
> Obviously, we're producing at a higher rate than Boeing right now. And so we're storing those additional fuselages in a buffer and they're there anywhere from say 15 to 25 days before we ship them to Renton, which is near Seattle.
>
> And so we've run those different scenarios. If Boeing goes down more, we would sit down and talk with them about what's the appropriate production level for us. That's why we didn't give guidance for the rest of this year. We still don't know when the MAX is going to go back into service. And we'll work closely with Boeing to determine what the right production level is.
>
> Now, what I would say though is that this period of time where we're at 52 gives us a chance to achieve some stability that we haven't had for a while. So, going back to 2016, we were shifting from the NG to the MAX. We were hiring lots of new people. We were going up 10% a year in terms of our rate from 42 to 47 then 52 then getting ready for 57. So, as you can imagine a lot of disruption a lot of extra costs as we were going through those learning curves.
>
> Now, we're going to be at 52 for an extended period of time which will allow us to get more stable and allow our supply chain to get healthy. And that will mean not only more stability, but also opportunities to improve quality, which is so important now in the industry -- probably more important than it's ever been.

37.     Also on October 31, 2019, Spirit filed a Form 10-Q with the SEC, which provided its

financial results and position for the fiscal quarter ended September 26, 2019 (the "3Q 2019 10- Q").

The 3Q 2019 10-Q stated that the Company's internal controls over financial reporting were effective:

> Our President and Chief Executive Officer and Senior Vice President and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of September 26, 2019 and have concluded that these disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the SEC rules and forms. These disclosure controls

and procedures include, without limitation controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports we file or submit is accumulated and communicated to management of the Company, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

38.    The 3Q 2019 10-Q also contained signed certifications by Defendants Gentile and Garcia pursuant to the Sarbanes-Oxley Act of 2002, which attested to the accuracy Spirit's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

39.    The statements referenced in Paragraphs 33–38 were materially false and/or misleading statements because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Boeing was sitting on a glut of unsold 737 MAX airplanes, and was therefore reasonably likely to suspend production; (ii) a production halt on the 737 MAX planes would have a significant negative impact on the Company's future financial results; (iii) the Company lacked effective internal controls over financial reporting; (iv) the Company did not comply with its established accounting principles related to potential contingent liabilities; and (v) as a result, Defendants' statements about Spirit's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

40.    On December 16, 2019, after the close of trading, Boeing announced that it was suspending all production of 737 MAX planes in 2020.  Of the reasons given, Boeing stated that because it had continued production of the 737 MAX planes "[t]hroughout the grounding," that it had "approximately [737 MAX] 400 airplanes in storage," and had halted production to maintain "supply chain health."  The press release stated, in pertinent part:

Throughout the grounding of the 737 MAX, Boeing has continued to build new airplanes and there are now approximately 400 airplanes in storage. We have previously stated that we would continually evaluate our production plans should the MAX grounding continue longer than we expected. As a result of this ongoing evaluation, we have decided to prioritize the delivery of stored aircraft and temporarily suspend production on the 737 program beginning next month.

We believe this decision is least disruptive to maintaining long-term production system and supply chain health. This decision is driven by a number of factors, including the extension of certification into 2020, the uncertainty about the timing and conditions of return to service and global training approvals, and the importance of ensuring that we can prioritize the delivery of stored aircraft. We will continue to assess our progress towards return to service milestones and make determinations about resuming production and deliveries accordingly.

41.     The impact of a 737 MAX production halt, which historically accounted for 50 percent of Spirit's revenues, was directly contrary to Defendants' recent positive assurances regarding 737 MAX production levels.  This production halt, therefore, would have a substantial negative impact on Spirit's financial outlook for 2020.  On this news, the price of Spirit stock declined $3.10, or nearly 4 percent on the following two trading days, closing at $75.78 on December 18, 2019.

42.     On January 10, 2020, during intraday trading, Spirit issued a press release announcing that due to Boeing's decision to suspend production of the 737 MAX planes, that it had terminated "approximately 2,800 employees at its Wichita, Kansas facility."  The press release additionally stated that due to Spirit's excess inventory and Boeing's hundreds of planes in storage, that once 737 MAX production resumed "levels [would] be lower than previously expected."  The press release stated, in pertinent part:

Spirit AeroSystems [NYSE: SPR] today issued a notice under the Worker Adjustment and Retraining Notification Act of layoffs affecting approximately 2,800 employees at its Wichita, Kansas facility. Spirit is taking this action because of the 737 MAX production suspension and ongoing uncertainty regarding the timing of when production will resume and the level of production when it does resume. This decision allows Spirit to begin aligning its cost structure to the production suspension and, after such suspension, what Spirit expects will be production levels lower than Spirit's levels in 2019.

Spirit is a significant supplier on the 737 MAX program, with its workshare accounting for 70 percent of the airplane's structure. This includes the entire fuselage, thrust reversers, engine pylons and wing components. In addition, the MAX represents more than 50 percent of Spirit's annual revenue.

Spirit has not received notice from its customer, Boeing, on how long the production suspension will last or what the production rate will be in the future. Spirit believes that, when production resumes, the levels will be lower than previously expected due, in part, to the customer's need to consume over 100 MAX shipsets currently in storage at Spirit's facilities. In addition, Boeing has several hundred MAX airplanes built but not yet delivered to its customers.

43.    On this news, the price of Spirit stock declined $3.09, or over 4 percent, to close at $69.70 on January 10, 2020.  As the market continued to digest the disappointing news, Spirit shares declined an additional $1.94 on the following trading day, closing at $67.76 on January 13, 2020.  All told this two day trading decline totaled $5.03, or 5 percent.

44.    To make matters worse, on January 30, 2020, before the market opened, the Company issued a press release announcing that Spirit had determined that it did not comply with its accounting procedures for potential contingent liabilities and that Defendants Garcia and Gilson had resigned.  The press release stated, in relevant part:

Spirit AeroSystems [NYSE: SPR] today announced the appointment of Mark Suchinski as Senior Vice President and Chief Financial Officer and Damon Ward as Interim Controller and Principal Accounting Officer, effective January 29, 2020. These appointments follow the resignations of Jose Garcia, Senior Vice President and Chief Financial Officer, and John Gilson, Vice President, Controller and Principal Accounting Officer.

"We are pleased to have Mark stepping into the CFO role," said Spirit AeroSystems President and CEO Tom Gentile. "Mark is a long-tenured and respected leader at Spirit, particularly within the finance team where he held a variety of key roles from 2006 to 2018, including serving as Controller and Principal Accounting Officer from 2014 to 2018. He brings a comprehensive understanding of our business and has strong relationships with both internal and external stakeholders. Mark is supported by Spirit's talented finance organization and is committed to our future success."

In December 2019, Spirit received information through its established compliance processes that led Spirit to commence a review of its accounting process compliance. As a result of the review, which is ongoing, Spirit

determined that it did not comply with its established accounting processes related to certain potential contingent liabilities that were received by Spirit after the end of third quarter 2019. As of today, Spirit believes this non-compliance will not result in a restatement of Spirit's financial statements for the third quarter ended September 26, 2019 or materially impact the financial statements for the fiscal year ended December 31, 2019. However, the review is ongoing and no final conclusion has been made. In light of these findings, Messrs. Garcia and Gilson tendered their resignations. Spirit has communicated about this matter with the Securities and Exchange Commission and anticipates fully cooperating with any inquiries the Commission may have.

Spirit is taking steps to strengthen procedures relating to contingent liabilities of this type to ensure they are processed correctly in the future. Spirit expects to file its Form 10-K for the 2019 fiscal year by the Securities and Exchange Commission's deadline.

45.    On this news, the Company's shares fell $2.56 per share or approximately 4 percent to close at $65.08 per share on January 30, 2020.

46.    In light of Boeing's decision to halt production on 737 MAX planes, Spirit announced on February 7, 2020, that it was declaring a dividend of $0.01, 92 percent down from the dividend of $0.12 issued in the past seven quarters.  The Company stated that the cut was necessary "to preserve liquidity until production rates are at higher levels."

47.    On February 28, 2020, premarket, Spirit issued a press release reporting its fourth quarter and full year 2019 financial results.  In the release, Spirit stated that the "grounding of Boeing's 737 Max program was a significant issue" for the Company, "particularly after Boeing suspended production."  As a result thereof, Spirit stated that it had been forced to take substantial measures to "preserve liquidity."  These measures included terminating over 3,000 employees, negotiating for an amendment to its credit facility providing for covenant relief into 2021, and securing a $375 million short-term delayed draw term loan facility.  The press release also stated that "[g]iven the continued uncertainty surrounding the timing of return to service of the 737 MAX, Spirit will not be providing guidance at this time."

48.     Finally, the Company gave further insight into its previous announcement that it may have failed to account for certain potential contingent liabilities.  In the earnings release, Spirit announced that it had identified a material weakness in its internal controls over financial reporting, and as a result thereof, the Company "should have recorded an incremental contingent liability for the third quarter of 2019 of less than $8 million."

49.     Also on February 28, 2020, Spirit held an earnings call with analysts and investors to discuss Spirit's 2019 financial results.  On the call Defendant Gentile revealed that 2020 737 MAX production rates would be over 66 percent lower than in 2019, and would not normalize for the next several years, stating in pertinent part:

> On January 30, we reached an agreement with Boeing regarding production and deliveries for 2020. We will produce and deliver 216 shipsets in 2020 compared to 606 shipsets in 2019. We will restart production slowly in the coming months, ramping up deliveries through the year to deliver about 70% in the back half of 2020. We do not expect to return to 52 shipsets per month until late 2022. Of course, this agreement is based on several assumptions, including the timing of the 737 MAX return to service and Boeing's expected production rate.

As a result, Defendant Gentile stated that cash flow will be "challenging . . . for the first half of 2020," stating in pertinent part:

> Given the 737 program is our largest contributor of cash and it represents half our revenue, the production halt and slow subsequent production ramp will be challenging in terms of cash flow for the first half of 2020.

50.     Additionally on the call, Mark Suchinski, the Company's newly-appointed CFO, stated that "2020 will be a difficult year," for Spirit, and that the Company will be forced to incur "excess costs resulting from the 737 MAX production suspension and subsequent production recovery schedule," stating in pertinent part:

> Looking ahead to the 2020 financial reports, it's important to note that per GAAP, we will be recognizing excess costs resulting from the 737 MAX production suspension and subsequent production recovery schedule separate from normal production contract costs.

* * *

>   As a result, these excess costs associated with the production suspension as well as the subsequent low rate production will be reflected as period results beginning in the first quarter of 2020 and will continue until the production resources are utilized at normal capacity.

* * *

>   2020 will be a difficult year, especially in terms of cash. And I can assure you that we will be diligently managing our liquidity and adjusting our cost structure to align to the lower levels of production. Currently, we're projecting negative overall free cash flow for 2020 with the majority of cash burn during the first half of the year.

51.    On this news, the price of Spirit stock declined $6.19 per share, or 10 percent on February 28, 2020, closing at a price of $52.84 per share.

52.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### UNDISCLOSED ADVERSE FACTS

53.    The market for Spirit securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Spirit's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Spirit securities relying upon the integrity of the market price of the Company's common stock and market information relating to Spirit, and have been damaged thereby.

54.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Spirit's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that

they failed to disclose material adverse information and/or misrepresented the truth about Spirit's business, operations, and prospects as alleged herein.

55.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made, or caused to be made a series of materially false and/or misleading statements about Spirit's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

56.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

57.    The Individual Defendants permitted Spirit to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

58.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Spirit, their control over, receipt, and/or modification of Spirit's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Spirit, participated in the fraudulent scheme alleged herein.

59.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit upon those who purchased or otherwise acquired Spirit securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Spirit's business, operations, and management and the intrinsic value of Spirit's securities and caused Plaintiff and members of the Class to purchase or otherwise acquire Spirit's securities at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

60.     During the Class Period, as detailed herein, Spirit and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Spirit securities, and operated as a fraud or deceit on Class Period purchasers of Spirit's securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Spirit's securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases or other acquisition of Spirit's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

61.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

62.    At all relevant times, the markets for Spirit's securities were efficient for the following reasons, among others:

(a)      as a regulated issuer, Spirit filed periodic public reports with the SEC;

(b)      Spirit regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, common stock analysts, and other similar reporting services;

(c)      Spirit was followed by several stock analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)      Spirit's stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "SPR."

63.    As a result of the foregoing, the market for Spirit's securities promptly digested current information regarding Spirit from all publicly available sources and reflected such information in the price of Spirit's securities.  Under these circumstances, all those who purchased or otherwise acquired

Spirit's securities during the Class Period suffered similar injury through their transactions in Spirit's securities at artificially inflated prices and the presumption of reliance applies.

64.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Spirit who knew that the statement was false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Spirit's securities during the Class Period (the "Class").  Excluded from the Class are: Defendants; the Excluded D&Os; members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their

participants or beneficiaries, to the extent they made purchases through such plan(s); any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

67.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Spirit's securities was artificially inflated; and

(f)     The extent of the damage sustained by Class members and the appropriate measure of damages.

68.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

69.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**Violations of Section 10(b) And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Spirit securities during the Class Period.

75.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Spirit's securities.  Plaintiff and the Class would not have purchased or otherwise acquired Spirit's securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

76.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or other acquisitions of Spirit's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     During the Class Period, the Individual Defendants participated in the operation and management of Spirit, and conducted and participated, directly and indirectly, in the conduct of Spirit's business affairs.  Because of their senior positions, they knew the adverse non-public information about Spirit's corporate governance and business prospects.

79.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Spirit's business practices, and to correct promptly any public statements issued by Spirit which had become materially false or misleading.

80.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Spirit disseminated in the marketplace during the Class Period concerning the Company's corporate governance and business prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Spirit to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Spirit within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Spirit securities.

81.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Spirit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

A.     Declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B.     Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.     Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 24, 2020

Respectfully submitted,

/s/ *William B. Federman*
William B. Federman (OBA # 2853)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

**LABATON SUCHAROW LLP**
Christopher J. Keller (*Pro Hac Vice to be filed*)
Eric J. Belfi
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

*Attorneys for Plaintiff*